IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRACY LYNN RHOUMA, | ) | Case No. 4:20-cv-2823 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER**[1] |
| Defendant. | ) | |

Plaintiff, Tracy Lynn Rhouma, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act.  Rhouma raises several challenges to the Administrative Law Judge's ("ALJ") decision.

Rhouma challenges as a violation of separation of powers the structure of Social Security

Administration ("SSA"), because, under 42 U.S.C. § 902(a)(3), the Commissioner does not serve

at the will of the president.  She additionally argues that: (i) the ALJ failed to adequately develop

the record in the face of an unrepresented claimant; (ii) the ALJ failed to adequately explain his

findings at Step Three of the sequential evaluation process; and (iii) the ALJ misevaluated the

opinion evidence and her subjective pain symptoms.  Rhouma lacks standing to contest the

constitutionality of the ALJ's decision based on the president's removal authority.  However,

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 12.

because the ALJ breached his duty to fully develop the record by obtaining psychiatry records identified at the ALJ hearing and which the ALJ agreed to obtain, when compounded by other issues in his decision, make a remand necessary. Therefore, the Commissioner's final decision denying Rhouma's applications for DIB and SSI must be vacated and Rhouma's case must be remanded for the ALJ to obtain the missing evidence and conduct further proceedings. And because we remand on that basis, we do not reach the merits of Rhouma's other challenges except to note that the ALJ may revisit the other aspects of his decision on remand.

## I.  Procedural History

On May 23, 2018, Rhouma applied for DIB and SSI. (Tr. 286, 292).[2] Rhouma alleged that she became disabled on April 30, 2018 due to: "1. right knee gave out; 2. right broken leg; [and] 3. left eye blindless." (Tr. 286, 292, 317). She later added "[n]erve issues" in her left arm and "pain and stiffness" in her neck. (Tr. 338). The SSA denied Rhouma's application initially and upon reconsideration. (Tr. 158-89, 192-221).

Rhouma requested a hearing and asked that her hearing be held via video conference due to concerns about her vehicle's reliability and her ability to drive in the dark. (Tr. 237, 276). An SSA representative informed Rhouma by voicemail that her request had been denied due to a lack of video equipment at the Youngstown, Ohio, field office and the ALJ's desire that she appear in person. (Tr. 278).

ALJ Gregory M. Beatty, heard Rhouma's case on January 16, 2020, at which Rhouma proceeded pro se, and denied the claims in an April 9, 2020 decision. (Tr. 84-96, 102-57). At Step Three of the sequential evaluation process, the ALJ determined that Rhouma's impairments did not meet or medically equal Listings 1.02, 2.02, and 11.14. (Tr. 89).

---

[2] The administrative transcript appears in ECF Doc. 11.

2

At Step Four of the sequential evaluation process, the ALJ determined that Rhouma had the residual functional capacity ("RFC") to perform light work, except:

> [Rhouma] may frequently push and/or pull with the bilateral upper extremities; [Rhouma] may frequently reach, in all directions, with the bilateral upper extremities; [Rhouma] may frequently handle, finger and feel with the left upper extremity; [Rhouma] may occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; [Rhouma] must be afforded a well-lit work environment; [Rhouma] must avoid concentrated exposure to workplace hazards, including unprotected heights, dangerous moving machinery and operation of a motor vehicle.

*Id.* Based on vocational expert ("VE") testimony that an individual with Rhouma's age, experience, and RFC could perform her past relevant work as a cardiac monitor technician as generally performed, and alternatively work as mailroom clerk, electronics worker, and package inspector, the ALJ found that Rhouma was not disabled. (Tr. 94-96). On October 23, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). On December 23, 2020, Rhouma filed a counseled complaint to obtain judicial review. ECF Doc. 1.

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Rhouma was born on December 15, 1970 and was 47 years old on the alleged onset date. (Tr. 158, 286). She completed high school and obtained an associate degree in applied sciences. (Tr. 117, 318). Rhouma also had specialized training as an emergency medical technician ("EMT") and in armed security. (Tr. 318). She had previously worked as an EMT from 2003 to 2004, a home health aide from 2005 to 2008, a cardiac monitor technician from 2009 to 2014, and once more as a home health aide from 2015 to 2018. (Tr. 117-19, 318, 326).

B.      **Relevant Medical Evidence**

1.      **Physical Impairments**

On November 13, 2017, Rhouma visited Tac Z. Lee, MD, reporting blurry vision and difficulty seeing at night.  (Tr. 391).  After evaluation, Dr. Lee diagnosed Rhouma with aphakia in the left eye, cataract in the right eye, and moderate glaucoma.  (Tr. 396).  Dr. Lee prescribed Alphagan, and Rhouma indicated she would get an updated prescription for her glasses.  *Id.*

On March 27, 2018, Rhouma visited Sanjeev Dewan, MD, reporting limited vision, congenital cataract, and aphakia.  (Tr. 401).  Rhouma reported that the year before, she started having trouble seeing at night, night glasses didn't help, and she was scared to have cataract surgery since she could only see out of her right eye.  *Id.*  Although she had been given a sample of Alphagan by Dr. Lee in 2017, she never used it.  *Id.*  Rhouma also reported itching eyes associated with burning and tearing, fading vision, and pain in the front of her head.  *Id.*  After examination, Dr. Dewan diagnosed Rhouma with: monocular exotropia, left eye; aphakia, left eye; amblyopia refractive, left eye; and myopia, right eye.  (Tr. 403).

On April 3, 2018, Rhouma presented to Tina Smith, PA, for left arm numbness/weakness and neck pain.  (Tr. 413).  Rhouma reported numbness in her fingers, involuntary movements, and arm spasms.  *Id.*  She stated she'd had cubital tunnel release surgery in 2016, with no improvement in her symptoms.  *Id.*  She also reported a history of asthma, chronic back pain, glaucoma, headache, hypothyroidism, neuropathy, osteoarthritis, and thyroid disease.  *Id.*  Upon physical examination, Rhouma had normal results, except for tenderness in her spine, 3/5-rated right grip strength, and hand atrophy.  (Tr. 415-16).  PA Smith assessed Rhouma with cubital tunnel syndrome, neck pain, hypothyroidism, and muscle spasm and referred Rhouma to

physical therapy.  (Tr. 416).  Rhouma failed to follow up with her prescribed treatment.  (Tr. 407).

On April 30, 2018, Rhouma fell and went to the hospital.  (Tr. 426).  She reported moderate right knee pain that was worsened by walking, as well as mild right ankle pain.  *Id.* She also reported increased pain with weightbearing.  *Id.*  Rhouma had normal physical examination results, except tenderness over the proximal fibula and right lateral knee joint and full but uncomfortable range of motion.  (Tr. 427).  X-rays of her lower extremities showed mild degenerative changes in the right hip and tibia fibula, moderate degenerative changes in her right ankle, fractures in her right foot, a calcaneal spur, and slight irregularity of the proximal fibula. *Id.*  A CT scan of Rhouma's right knee showed a nondisplaced proximal fibular fracture.  *Id.*

The attending nurse practitioner diagnosed Rhouma with closed fracture of the proximal end of the right fibula, closed nondisplaced avulsion fracture of the right talus, and closed nondisplaced fracture of the navicular bone of the right foot.  (Tr. 428).  Rhouma was discharged with pain medication.  (Tr. 427-28).

On September 21, 2018, Rhouma visited Armand Minotti, DO, reporting left arm pain and occasional dizziness spells.  (Tr. 471).  Upon examination, Rhouma had normal results.  (Tr. 472).  However, Dr. Minotti noted she had a history of obesity, fatigue, leg edema, and elevated blood pressure.  (Tr. 471).  Rhouma had a BMI of 38.6.  *Id.*  Dr. Minotti diagnosed Rhouma with hypertension, hypothyroidism, cervical disc disorder with radiculopathy (cervicothoracic region), mixed hyperlipidemia, and Vitamin D deficiency.  (Tr. 472).  Dr. Minotti ordered an EMG and an x-ray of Rhouma's cervical spine.  *Id.*  Rhouma underwent x-ray examination that same day, which was "unremarkable."  (Tr. 474).

On October 5, 2018, Rhouma returned to Dr. Minotti, reporting that she had gotten a prescription for medical marijuana to treat her chronic left arm/shoulder pain.  (Tr. 476).  Upon examination, Rhouma had normal results except decreased range of motion in the left shoulder.  (Tr. 477).  Dr. Minotti diagnosed Rhouma with hypertension, hypothyroidism, mixed hyperlipidemia, adhesive capsulitis of the left shoulder, cervical disc disorder with radiculopathy, and obesity (BMI of 38.6).  (Tr. 476-77).  Dr. Minotti issued referrals to other providers.  (Tr. 477).

On October 15, 2018, Rhouma underwent EMG testing of her upper extremities, with normal results and no diagnostic evidence of cervical motor radiculopathy.  (Tr. 480-82).

On November 12, 2018, Rhouma visited Stephanie Kopey, DO, upon Dr. Minotti's referral, reporting back, neck, and left arm and shoulder pain.  (Tr. 488).  Rhouma reported constant, daily left medial hand and digit pain (rated at 4/10).  *Id.*  She also described tingling and burning pain in the neck and medial fourth and fifth digits.  *Id.*  Upon physical examination, Rhouma had normal results except for obesity and diminished left medial arm, forearm, and hand sensation.  (Tr. 490).  Dr. Kopey diagnosed Rhouma with paresthesia, cubital tunnel syndrome on left, and neck pain and ordered an MRI.  (Tr. 491).

On January 3, 2019, Rhouma visited Milad Saleh Abusag, MD, for management of her hypothyroidism.  (Tr. 520-21).  Upon physical examination, Rhouma had normal results.  (Tr. 523).  Dr. Abusag diagnosed Rhouma with a history of subclinical hypothyroidism that was currently "normal," a history of hypercalcemia, and Vitamin D deficiency.  (Tr. 524).  Dr. Abusag ordered a DEXA bone density axial skeleton exam.  *Id.*

On February 12, 2019, Rhouma visited Joshua Gordon, MD, for a neurologic examination.  (Tr. 499-502).  Rhouma reported neck pain, numbness in her left arm, occasional

6

shooting pains in the hand and arm, and involuntarily arm movements.  (Tr. 500).  Rhouma also reported that she felt like her neck could not support her head, joint discomfort, right knee issues that affected her ability to walk, and night sweats.  *Id.*  Upon examination, Rhouma had normal attention and reasoning, intact fund of knowledge, normal cranial nerves, normal cerebellar and coordination, negative Romberg test, and normal gait and station.  (Tr. 501-02).  However, Rhouma also had a pattern of weakness secondary to pain in the left upper extremity, a suggestion of positive Hoover's sign, and patchy decrease sensation to pinprick in the left upper extremity.  *Id.*  Rhouma also brought a video of her left arm, which appeared to display dystonia.  (Tr. 502).  Dr. Gordon ordered an MRI.  *Id.*

On March 8, 2019, Rhouma underwent an MRI scan of her brain, which showed patchy white matter signal abnormalities that were nonspecific and upon which demyelination could not be excluded.  (Tr. 533-34).  On March 14, 2019, Rhouma called Dr. Gordon's office about the MRI results because she was concerned that she had multiple sclerosis and wanted an answer before she moved to Arizona.  (Tr. 567).  On March 15, 2019, Dr. Gordon advised Rhouma over the phone to see a movement specialist, noting that the MRI indicated a low suspicion for multiple sclerosis.  (Tr. 498-99, 567-68).

On April 2, 2019, Rhouma returned to Dr. Dewan for a follow up on her exotropia.  (Tr. 583).  She also informed Dr. Dewan of her March 8, 2019, MRI results.  *Id.*  Dr. Dewan confirmed Rhouma's diagnoses, noting that her aphakia was stable.  (Tr. 587).

On June 20, 2019, Rhouma underwent a DEXA bone density axial skeleton exam, which showed osteopenia in the L1-L4 region, her right hand, and her left hip and mild increased fracture risk.  (Tr. 536, 547-48).  On July 3, 2019, Rhouma returned to Dr. Abusag for a follow up.  (Tr. 515-19).  Her physical examination results were identical to those of her previous visit.

(Tr. 518).  Dr. Abusag confirmed Rhouma's diagnosis of history of subclinical hypothyroidism and Vitamin D deficiency and added a diagnosis of hypercalcemia.  (Tr. 519).

On August 15, 2019, Rhouma visited the Neurology Center of Salem and was seen by Chaohua Yan, MD, to check on symptoms of dizziness and weakness.  (Tr. 539, 611).  Rhouma described her dizziness as a spinning sensation and sensation of movement that began the year before.  *Id.*  She had moderate dizziness episodes weekly that were exacerbated by lying down and standing.  *Id.*  She also had associated symptoms of nausea, vomiting, ear fullness, and visual changes.  *Id.*  In discussing her history of seizures, Rhouma also stated she suffered severe generalized weakness, memory difficulties, trouble walking down steps, unsteadiness, and paresthesia in the left hand.  (Tr. 611).  On the day of her visit with Dr. Yan, Rhouma reported monthly episodes in which she would wake up and feel as though someone was shaking her violently when she lifted her head off the pillow, followed by nausea, vomiting, and muscle weakness lasting several hours.  *Id.*  Rhouma also reported intermittent episodes of numbness and tingling in her wrists.  (Tr. 611-12).

Upon examination, Rhouma had normal results, except she had unsteady gait, 4/5-rated left extremity strength, myoclonus of the left upper extremity, impaired tandem walking, and positive Romberg sign.  (Tr. 613-14).  Dr. Yan ordered an EEG to evaluate Rhouma's seizure-like symptoms and a lumbar puncture to assess her demyelinating changes in the brain.  (Tr. 611).  Dr. Yan further prescribed aspirin as a stroke prophylaxis for white matter disease, no treatment for her paresthesia, and prescribed Vitamin B12 supplements for a B12 deficiency.  (Tr. 611-12).  On August 27, 2019, Rhouma underwent an EEG exam, which was unremarkable.  (Tr. 609).  On October 9, 2019, Rhouma underwent a lumbar puncture, with a resulting diagnosis of multiple sclerosis.  (Tr. 572-73).

On October 28, 2019, Rhouma returned to the Neurology Center of Salem and was seen by Beth Earles, APRN-CNP.  (Tr. 601).  Rhouma reported upper extremity numbness that had been worsening over the previous month.  (Tr. 602).  Upon examination, she had normal results, except for unsteady gait, paresthesia, 4/5-rated left extremity strength, myoclonus of the left upper extremity, impaired tandem walking, and positive Romberg sign.  (Tr. 603-04).  Nurse Practitioner Earles ordered EMG testing of Rhouma's extremities, continued aspirin, and referred Rhouma for treatment at another facility for her seizure-like symptoms.  (Tr. 601-02).

### 2.    Mental Impairments

On April 30, 2019, Rhouma completed an in-home psychiatric diagnostic evaluation with Tammy Eisenbraun, LSW, from the Bair Foundation following a referral for depressive symptoms and anger issues.  (Tr. 617).  Rhouma said she wanted treatment for depressive and anxiety symptoms.  (Tr. 629).  Rhouma reported that she felt like a leech on society and did not think her son should be taking care of her, she ruminated over things, was sad every day, and experienced daily anxiety symptoms.  (Tr. 617, 624).  She also reported flashbacks from when her first husband was murdered, anxiety due to her inability to drive and financial situation, and worry about taking medication.  (Tr. 624).  Upon examination, Rhouma had appropriate appearance and affect, good hygiene, clear speech, cooperative behavior, normal orientation, unremarkable thought content, euphoric mood, and adequate insight and judgment.  (Tr. 625-26).  She reported no limitations on her activities of daily living.  (Tr. 619).  Licensed Social Worker Eisenbraun diagnosed Rhouma with major depressive disorder, post-traumatic stress disorder, and generalized anxiety disorder.  (Tr. 622).

### C.      Relevant Opinion Evidence

#### 1.      Consultative Examiner – Nicholas Arnold, MD

On August 18, 2018, Rhouma was examined by Nicholas Arnold, MD, for her neck and left arm pain.  (Tr. 459).  Rhouma reported that her pain began in 2011, and she had received surgery, chiropractic care, and physical therapy.  *Id.*  She also reported numbness, tingling, and muscle spasms that were exacerbated by pressure and physical activity.  *Id.*  Her pain was on average rated 4/10 in severity and rated 3/10 on exam, which affected her ability to work secondary to difficulty lifting and reaching.  *Id.*  Rhouma further stated her typical daily activities consisted of cooking, housework, walking, shopping, doing laundry, sweeping, washing dishes, using the internet, driving, caring for pets, and making the bed.  (Tr. 460).

Upon examination, Rhouma had normal cranial nerve exam except for a superiorly deviated left pupil as a result of her congenital cataract, from which she could only see gross objects.  (Tr. 461, 463).  Rhouma had steady and symmetric gait, grossly normal manipulative abilities, good hand-eye coordination, negative Romberg sign, normal memory, and good concentration.  (Tr. 461-62).  But Rhouma also had: (1) tenderness to palpation over her neck; (2) positive Tinel's test along the left medial elbow with tapping near the ulnar nerve that extended paresthesia down into the fourth and fifth digit; (3) 4+/5-rated strength in the left hand; (4) numbness in the left fourth and fifth digits and thumb; (5) crepitus over the knees with range of motion pain, and she was wearing a knee brace on the right knee; (6) moderate difficulty squatting and rising from a squat; (7) moderate difficulty walking on heels and toes; and (8) abnormal tandem walking.  (Tr. 462-63).

Dr. Arnold opined that Rhouma had: (1) no sitting limitations; (2) mild standing and walking limitations due to neck and left-hand pain; (3) no need for assistive devices when

traveling and on uneven terrain; (4) mild limitations with lifting and carrying weight due to her neck and left-hand pain; (5) no limitations bending and stooping; (6) no visual or communicative limitations; and (7) "relevant" work place environmental limitations due to left hand numbness. (Tr. 464).  Dr. Arnold further opened that Rhouma could occasionally crouch, squat, reach, grasp, handle, finger, and feel.  *Id.*

### 2.    State Agency Consultants

On August 30, 2018, Douglas Chang, MD, evaluated Rhouma's physical limitations based on the medical evidence and determined she had the RFC to perform light work.  (Tr. 167-69, 172).  Dr. Chang found that Rhouma could lift 20 pounds occasionally and 10 pounds frequently; sit/stand/walk for 6 hours in an 8-hour workday; use controls, push, and pull occasionally; climb ramps and stairs, stoop, kneel, crouch, and crawl occasionally; never climb ladders, ropes, or scaffolds; and reach, handle, finger, and feel frequently.  (Tr. 167-69).  On December 20, 2018, Gerald Klyop, MD, concurred with Dr. Chang's assessment.  (Tr. 200-03, 205).

### D.    Relevant Testimonial Evidence

During his introductory remarks at the hearing, the ALJ noted that Rhouma was not represented.  (Tr. 104).  The ALJ advised Rhouma that she had the right to be represented by an attorney or non-attorney representative, how a representative could help her obtain information and protect her rights, and the availability of legal service organizations that offer free legal services.  (Tr. 105).  The ALJ also advised her she had the right to proceed without a representative, in which case the ALJ would obtain relevant records and question her during the proceeding.  *Id.*  Rhouma stated she understood and wished to proceed without a representative. (Tr. 105-06).

The ALJ then went over the then-current medical record, asking Rhouma which treatment providers she was seeing. (Tr. 107). Rhouma indicated that a representative of the Bair Foundation had told her to call Comprehensive Psychiatry to get an appointment. (Tr. 109-10). Rhouma stated she had gone to one appointment, with a second one in the coming week. (Tr. 110-11). The ALJ indicated he would have the record updated and send to Rhouma any records that the SSA received. (Tr. 112-13).

Rhouma was subsequently sworn in and testified that she lived alone in a house. (Tr. 114-15). She depended on her son and mother for financial support. (Tr. 116). She had a driver's license but was limited to driving during daylight because of her vision. *Id.* She also could not travel long distances because of tremors in her right leg. *Id.* Her past work as a cardiac monitor technician consisted of watching a bank of heart monitors while sitting down and reporting any changes to nurses and doctors. (Tr. 118).

Rhouma testified she could not work because, first, her eyesight caused her to trip over objects. (Tr. 119). Her left eye could see light, shadows, and objects moving around. (Tr. 124). Her left arm was numb from the forearm down, weak, and would shake involuntarily. (Tr. 120). The numbness started seven years earlier (2013), and she underwent an ulnar nerve release in 2016 once she started having pain. (Tr. 121). Since then, her arm has gotten worse, with more muscle loss. (Tr. 122). The pain felt like someone was jamming an icepick into her wrist and ripping up her arm. *Id.* At the time of the hearing, she wasn't seeing anyone for her arm symptoms. (Tr. 122-23).

Rhouma testified that she was told she would need surgery if her calcium levels didn't go down. (Tr. 123). She stated the high calcium levels caused her to have day-long dizziness spells. *Id.* She would sometimes be loading the dishwasher and suddenly lose all her strength

and energy and become lightheaded.  *Id.*  She also needed to hold on to something while climbing stairs.  (Tr. 124).

Rhouma testified she was being treated at Comprehensive Psychiatry for anxiety, severe depression, and panic attacks in crowded settings.  *Id.*  Every time she went to Walmart, she would shake, get nervous, and have an upset stomach.  *Id.*  She also received treatment from the Bair Foundation, but Licensed Social Worker Eisenbraun missed several appointments and didn't do much.  (Tr. 125).  Her anxiety and depression began around May 2018, after she broke leg, and had worsened since she quit working.  (Tr. 125-26).

Rhouma testified that the day before the hearing, she woke up at 11:00 a.m., went to get a haircut, played a game on her phone with her son, and then went to the park.  (Tr. 129).  Although she went to the park, she didn't stray far from the car because there were areas she couldn't walk in and she would lose energy.  *Id.*  After the park, she and her son went to the hardware store, after which her mid-back started hurting.  *Id.*  She then stayed home.  *Id.*

Rhouma testified that she cooked by leaving items on the stove on low and sitting while they cooked.  *Id.*  She could clean, but she had to take intermittent breaks, and she could not sweep and mop all in one day.  (Tr. 130).  Rhouma could grocery shop, but she often used the rideable shopping carts.  (Tr. 131-32).  Her hobby was photography, but she could not always do it with the shaking.  (Tr. 132).

The ALJ then asked whether Rhouma had anything else she wanted to say.  *Id.*  Rhouma added only that she could not get a definitive diagnosis from any doctor, as she stopped getting answers once they found out she was applying for disability.  *Id.*  Prompted by the judge, Rhouma told the court she'd like the ALJ to speak with her mother and son.  *Id.*

13

Luellen Bozek, Rhouma's mother, testified that she used to see Rhouma every week.  (Tr. 133-34).  Bozek testified she had seen Rhouma drop a lot of things because of spasms in her hands.  (Tr. 134-35).  Rhouma would have dizzy spells and headaches when she would need to sit down till it passed.  (Tr. 135-36).  Sometimes, Bozek couldn't get a hold of Rhouma over the phone until the evening because she spent the whole day in bed with headaches and vomiting.  (Tr. 136).  Bozek never knew if her daughter was sleeping during the day because Rhouma had night sweats that inhibited her ability to sleep.  (Tr. 137-38).  Bozek was also concerned about Rhouma's mental health because Rhouma had told Bozek around October 2019 that she was not going to be a burden for much longer and would convey suicidal ideations.  (Tr. 138).

Thair Sarbal, Rhouma's son, testified that he lived with his mother from 2009 to April 2019.  (Tr. 141-42).  Sarbal testified that what he believed prevented Rhouma the most from working was depression, which had gotten progressively worse over the years.  (Tr. 142).  Rhouma's depression inhibited her ability to think clearly or beyond her current situation.  (Tr. 143).  Sometimes, around once a month, she would lie in bed all day without motivation to get out of bed to use the restroom, eat, or make calls.  *Id.*

Sarbal testified that Rhouma's eyesight only impeded her driving at night, and it was difficult for her to see anything in a shadow.  (Tr. 144).  When describing Rhouma's fall, Rhouma interjected to correct Sarbal that it occurred in 2018 and that it was her leg, not her ankle, that broke.  (Tr. 145, 149).  Sarbal further testified that he often saw Rhouma's fingers cramp, and she needed help unclasping them.  (Tr. 145-46).  Sarbal also noticed muscle loss in Rhouma's arms and that her arm would spasm outward in a random direction.  (Tr. 146).

Sarbal testified that while he lived with Rhouma, Rhouma had difficulty lifting the laundry basket.  (Tr. 147).  He also noticed Rhouma's legs "don't want to step up," so he would

14

carry her laundry up and down the steps.  *Id.*  Otherwise, Sarbal did the yardwork, shoveled snow, lifted heavy items, and carried most grocery bags.  (Tr. 147-48).

The ALJ next called Kevin Z. Yi, a vocational expert ("VE"), to testify.  (Tr. 150). Rhouma did not object.  *Id.*  The VE was asked to assume a hypothetical person with Rhouma's age, education, and experience limited to light work and who was additionally limited to: frequent hand controls on the left; frequent handing, fingering, and feeling on the left; occasional ramps and stairs, no ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, and crawling; and no concentrated exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle.  (Tr. 151-52).  The VE testified such an individual could perform Rhouma's past work as a cardiac monitor technician.  (Tr. 152).  The VE testified the individual could also work as a mailroom clerk, electronic worker, and packaging inspector.  *Id.*

If the person were additionally limited to occasional handling, fingering, and feeling on the left, the VE testified the hypothetical individual would still be able to perform the same work. (Tr. 152-53).  If further restricted to sedentary work, the VE testified the hypothetical individual would still be able to work as a cardiac monitor technician, which was sedentary work.  (Tr. 153).  Rhouma interjected to ask a question, and the ALJ said she could say something in a moment.  *Id.*

The VE testified that a hypothetical individual limited to the sedentary exertional level could also work as an order clerk, laboratory tester, and account clerk.  (Tr. 154).  If limited to simple routine work and not a production rate, the VE testified the individual could not perform Rhouma's past work.  *Id.*  But the VE testified that the alternative jobs at the light and sedentary exertion levels could still be performed if the individual were limited to simple routine tasks, no production rate pace, and occasional interaction with others.  (Tr. 154-55).

15

The ALJ then asked Rhouma what she wanted to say.  (Tr. 155).  Rhouma stated her past work as a cardiac monitor technician involved a lot of typing, being on a computer, and using tiny calipers to measure the heart rhythms.  *Id.*  Her typing skills were "hunt and peck [at] best" and she could no longer type with her left hand.  *Id.*  The ALJ concluded the hearing, telling Rhouma he would send her any additional records the ALJ received.  (Tr. 155-56).

On March 9, 2020, after the hearing, the ALJ sent a letter to Rhouma informing her that SSA obtained additional evidence that he proposed to enter into the record, which was enclosed in an encrypted CD.  (Tr. 379).  The second page of the letter informed her she could, among other things, submit written comments on the evidence, a statement of facts, additional evidence, questions, and a request for a supplemental hearing.  (Tr. 380).  The letter also informed her that if she did not respond within ten days, the ALJ would assume she did not wish to submit additional material into the record.  *Id.*

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means

– and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Separation of Powers Violation

Rhouma argues that former-Commissioner Andrew Saul's appointment violated the principle of separation of powers because 42 U.S.C. § 902(a)(3) provides for a six-year term and makes the Commissioner removable only upon a finding of neglect of duty or malfeasance in office, which was similar to the statute held to violate separation of powers in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) (hereafter "*Seila Law*").  ECF Doc. 14 at 9. Therefore, Rhouma argues that the Commissioner had no authority to carry out any functions of his office and, by extension, the ALJ had no authority to adjudicate Rhouma's applications, necessitating a remand.  ECF Doc. 14 at 9-10.

The Commissioner concedes that § 902(a)(3) violates the principle of separation of powers but argues that Rhouma is nevertheless not entitled to a remand on that basis because,

under *Collins v. Yellen*, 141 S. Ct. 1761 (2021), she has not shown that she was actually harmed by the unconstitutional restriction on the president's removal authority.[3]  ECF Doc. 17 at 3-4. Specifically, the Commissioner argues that Rhouma was not harmed because the ALJ's appointment had been ratified in July 2018 by then-Acting Commissioner Nancy Berryhill, who was not subject to the unlawful removal provision and was presumptively removable at-will. ECF Doc. 17 at 6-7.  The Commissioner alternatively argues, relying on Justice Kagan and Justice Thomas's concurring opinions in *Collins*, that Rhouma cannot show actual harm because she cannot show the unconstitutional removal provision inflicted compensable harm on her. ECF Doc. 17 at 8-10.  The Commissioner argues that because Rhouma does not contest whether Saul was properly appointed under the Appointments Clause, he did not exercise authority he did not possess and, by extension, neither did the ALJ.  ECF Doc. 17 at 8-9.  The Commissioner argues Rhouma must show the president's inability to remove Saul under the removal provision affected the ALJ's decision, which the Commissioner argues Rhouma has not done.  ECF Doc. 17 at 9-10.

Rhouma replies, in relevant part, that the Commissioner' failure to raise a standing challenge means she has standing to raise her constitutional argument.  ECF Doc. 19 at 3.  She argues that the unconstitutional nature of the removal restriction was itself sufficient harm to warrant a remand because the ALJ and the Appeals Council issued their rulings based on policies and regulations promulgated by Saul, including the way musculoskeletal impairments are

---

[3] Because the court concludes that, under *Collins* and related caselaw, Rhouma lacks standing to raise her constitutional challenge, the Commissioner's other alternative theories for why remand on this issue is not warranted (as well as Rhouma's reply to those theories) are not addressed.

evaluated.  ECF Doc. 19 at 4-5.  And, Rhouma argues, the ALJ acted under improper delegated authority as a consequence of the unlawful removal provision.[4]  ECF Doc. 19 at 4-5.

The judicial power of the federal courts "is limited to 'cases' and 'controversies.'" *Muskrat v. United States*, 219 U.S. 346, 356 (1911); U.S. Const. art. III § 2.  From the case-and-controversy requirement of the Constitution stems the doctrine of standing, which asks "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009).  This ordinarily requires that a plaintiff show "(1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).  But when a plaintiff challenges a statutory restriction on the president's power to remove an executive officer, the plaintiff can establish standing "by showing that [she] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void."  *Collins*, 141 S. Ct. at 1788 n.24.

Both in *Seila Law* and *Collins*, the Supreme Court confronted separation-of-powers challenges to the structure of single-head executive agencies.  The Court first addressed the structure of the Consumer Finance Protection Bureau ("CFPB") under 12 U.S.C. § 5491(c)(3), which made the CFPB Director removable only for "inefficiency, neglect of duty, or malfeasance."  *Seila Law*, 140 S. Ct. at 2191-92.  Without addressing whether the petitioner had

---

[4] Rhouma's reply brief makes a single-sentence statement that Saul was not "constitutionally appointed," but two sentences later states [t]he argument raised by Plaintiff, however, was not an [A]ppointments [C]lause challenge."  ECF Doc. 19 at 5.  Any Appointments Clause challenge Rhouma may have attempted to raise through her reply is forfeited – both for having raised it for the first time in reply and for raising it perfunctorily.  *Williamson v. Recovery Ltd. P'ship*, 931 F.3d 608, 621 (6th Cir. 2013); *Colvin v. Comm'r of Soc. Sec.*, No. 4:18CV1249, 2019 U.S. Dist. LEXIS 168743, at *11 (N.D. Ohio Sept. 30, 2019).

standing to raise a separation of powers argument in the district court in the first instance,[5] the Court held that § 5491(c)'s restrictions on the president's authority to remove the single head of the CFPB violated the principle of separation of powers. *Id.* at 2197.

The Court then addressed the structure of the Federal Housing Finance Agency ("FHFA") under 12 U.S.C. § 4512(b)(2), which made the Director of the FHFA removable by the president only "for cause." *Collins*, 141 S. Ct. at 1770. The challenge came to the Court after the FHFA amended the formula used to calculate the amount Fannie Mae and Freddie Mac were required to pay to the U.S. Department of the Treasury in dividends. *Id.* at 1774-75. The Court determined first that the companies' shareholders had standing to bring their constitutional claim because: (1) the FHFA transferred the value of their property rights in the companies (their net worth) to the Treasury via the variable dividend formula, constituting an injury in fact; (2) the injury was traceable to the FHFA's adoption and implementation of the amendment; and (3) the injury was potentially redressable. *Id.* at 1779. The Court went on to conclude that a straightforward application of *Seila Law* led to the conclusion that § 4512(b)(2)'s removal restrictions also violated separation of powers. *Id.* at 1783-84. Justice Kagan, somewhat prophetically, predicted the structure of the SSA would be "next on the chopping block." *Id.* at 1802 (Kagan, J., concurring).

Rhouma lacks standing to challenge the constitutionality of the SSA's structure. Rhouma reads the Commissioner's brief as addressing only the merits of her constitutional claim, which she contends establishes she has standing. ECF Doc. 19 at 3. There are two issues with that position. First, although the Commissioner doesn't use the word "standing," she argues that

---

[5] *Seila Law* instead determined that the petitioner had appellate standing because (1) the petitioner had been compelled to comply with a civil investigative demand from the CFPB and provide documents it would prefer not to, (2) the injury was traceable to the appellate court's decision, and (3) the injury would be redressed by a reversal of the appellate court's decision. 140 S. Ct. at 2196.

Rhouma has not established a "nexus" between § 902(a)(3)'s removal restrictions and an alleged

harm.  *See* ECF Doc. 17 at 6-10.  Although intermingled with arguments concerning what

remedy Rhouma could obtain, the Commissioner has effectively argued that Rhouma has not met

the traceability requirement for standing.

Second, and more importantly, "[a]s a jurisdictional requirement, standing … *cannot be*

*waived or forfeited.*"  *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019)

(emphasis added).  And the court can raise standing on its own even when the parties don't.

*Loren v. Blue Cross & Blue Shield*, 505 F.3d 598, 607 (6th Cir. 2007); *e.g.*, *Keyes v. Banks*, No.

20-6034, ___ F. App'x ___, 2021 U.S. App. LEXIS 17966, at *4 (6th Cir. June 15, 2021)

(unreported); *Lindenbaum v. Energy Servs. Providers*, No. 1:21-CV-00764, 2021 U.S. Dist.

LEXIS 133363, at *9 (N.D. Ohio July 19, 2021); *Walker v. United States*, No. 1:20-CV-01392,

2021 U.S. Dist. LEXIS 50779, at *12 (N.D. Ohio Mar. 18, 2021).

Rhouma argues that she has standing because her administrative proceedings were

conducted pursuant to polices and regulations implemented by Saul.  ECF Doc. 14 at 9-10; ECF

Doc. 19 at 3-4.  But that's not enough.  "[T]he unlawfulness of the removal provision does not

strip the [Commissioner] of the power to undertake the other responsibilities of his office."

*Collins*, 141 S. Ct. at 1788 n.23.  As Justice Thomas's concurring opinion clarifies, Rhouma

must do more than point to a conflict between 42 U.S.C. § 902(a)(3) and the Constitution; she

must show some action on the part of Saul that was unlawful and harmful to her.  *See id.* at 1790-

91 (Thomas, J., concurring).  More to the point, Rhouma must show that the policy and

regulatory changes implemented by Saul adversely affected her.  *See Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 559 n.1 (1992) ("[T]he injury must affect the plaintiff in a personal and

individual way.").  She has pointed to changes in the Hearings, Appeals and Litigation Law

Manual and the way musculoskeletal impairments are evaluated, but she has not argued how those changes made it more or less likely that her applications would be denied.  ECF Doc. 19 at 4-6.  This is in stark contrast to the shareholders in *Collins*, who identified an injury (the loss of net worth in companies in which they owned shares) traceable to the Director's unlawful action (amending the formula to calculate dividends).  141 S. Ct. at 1779.  Without a harm traceable to an unlawful action by the Commissioner, Rhouma does not have standing to challenge the constitutionality of § 902(a)(3).  *See S.W. v. Comm'r of Soc. Sec.*, No. 3:20-cv-05602, 2021 U.S. Dist. LEXIS 219306, at *20-21 (W.D. Wash. Nov. 12, 2021) (concluding similarly).  Thus, regardless of the remand conclusion expressed below, Rhouma is not entitled to a remand based on her constitutional challenge.

### C.    ALJ Hearing[6]

Rhouma argues that, in light of her unrepresented status, the ALJ failed to provide her a full and fair hearing.  ECF Doc. 14 at 10.  Specifically, she argues the ALJ failed to meet his heightened duty to develop the record when the ALJ did not obtain information "regarding testing for possible multiple sclerosis" and from Comprehensive Psychiatry.  ECF Doc. 14 at 11.  Rhouma appears to argue that additional evidence of her psychiatric treatment would have supported a finding that she was limited to unskilled work due to her major depressive disorder, PTSD, and generalized anxiety disorder, thereby precluding her from performing her past work.  ECF Doc. 14 at 11, 14.  She also appears to argue the ALJ erred by not referring her for a psychological consultative examination.  ECF Doc. 14 at 12.  Rhouma also argues: she was denied a full and fair hearing because the ALJ refused her request for a video hearing; the ALJ did not inform her that she should respond to the post-hearing letter regarding new evidence;

---

[6] We address the remaining issues raised in Rhouma's brief out of order in light of the dispositive nature of her challenge to the propriety of her ALJ proceedings.

there was no indication the disc referenced in the letter was ever received by Rhouma; and the ALJ did not ask Rhouma whether she wanted to question any of the witnesses.  ECF Doc. 14 at 12.

The Commissioner responds that the ALJ did not owe Rhouma a heightened duty to develop the record because she was capable of presenting an effective case, the transcript reflects an understanding of the hearing procedures and no confusion, the ALJ hearing lasted over an hour with a lengthy transcript, and the ALJ adequately explained to Rhouma her right to an attorney.  ECF Doc. 17 at 16-17.  The Commissioner further argues that Rhouma has not shown prejudice on account of the ALJ's denial of her request for a video hearing or that a video hearing was required.  ECF Doc. 17 at 17.  The Commissioner argues the ALJ expressly told Rhouma she could ask questions, which she did, and informed her of her ability to respond to the letter.  Id. at 17-18.  The Commissioner also argues that Rhouma obtained a representative after the ALJ hearing and submitted new evidence to the Appeals Council, which did not include the evidence she faults the ALJ for not obtaining.  ECF Doc. 17 at 18.

Rhouma replies that the ALJ erred by not advising her at the hearing that she should respond to the letter.  ECF Doc. 19 at 1.  She contends the letter gave insufficient notice of her ability to respond because the notice was on the second page, which she contends "was not reasonable for a lay person, even with two years of college."  Id. at 2.

Due process requires that social security proceedings be "full and fair," and it falls on the ALJ to ensure every claimant receives a full and fair hearing.  Flatford v. Chater, 93 F.3d 1296, 1305 (6th Cir. 1996); Lashley v. Sec'y of Health & Hum. Servs., 708 F.2d 1048, 1051 (6th Cir. 1983).  Consequently, the ALJ has an affirmative duty to develop the record.  Cox v. Comm'r of Soc. Sec., 615 F. App'x 254, 262 (6th Cir. 2015).  But the burden is nevertheless on the claimant

to provide a complete record. *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003); *see also Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).

The ALJ's duty to fully develop the record is heightened in special circumstances, such as "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008). Once the heightened duty arises, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Lashley*, 708 F.2d at 1052 (quotation marks and citations omitted). There is no bright-line test for determining when the ALJ has adequately discharged his duty, such that the determination must be made on a case-by-case basis. *Id.*

The court finds that the ALJ breached his duty to develop the record. Rhouma's pro se status at the ALJ hearing is not sufficient on its own to trigger the heightened burden. *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); *see also Wilson*, 280 F. App'x at 459 (concluding the heightened standard was not triggered because the transcript disclosed the claimant's grasp of the proceedings and her adequacy of her case presentation). Weighing against a finding that the heightened standard was triggered was Rhouma's silence on the issue of whether she was incapable of presenting an effective case or unfamiliar with hearing procedures. ECF Doc. 14 at 10-12. Rhouma had an associate degree in applied sciences, completed two specialized training courses, and had prior work experience in skilled and semi-skilled work. (Tr. 117, 318, 378). Rhouma was adequately advised of her right to counsel, and the ALJ proceeded with the hearing only after she confirmed she understood her rights and wished to proceed without representation. *Vaca v. Comm'r of Soc. Sec.*, No. 1:08-CV-653, 2009

24

U.S. Dist. LEXIS 125529, at *11-12 (W.D. Mich. Aug. 18, 2009); (Tr. 105-06).  Throughout the course of the hearing, Rhouma was capable of answering questions.  *See* (Tr. 114-32).  And Rhouma interjected at various points of the ALJ's examination of Bozek and Sarbal.  (Tr. 138-39, 145, 147, 149).

All that said, however, other circumstances lead the court to conclude that the ALJ owed Rhouma a heightened duty to develop the record.  After Rhouma affirmed her desire to proceed without counsel, the record isn't clear on whether Rhouma knew what was in the record at the time of the hearing.  The ALJ told Rhouma that had she arrived earlier, she could have been shown what evidence was on file.  (Tr. 107).  Yet without confirming whether Rhouma knew what evidence there was on file or taking a recess for her to examine that evidence, the ALJ asked whether she had any objections to admitting the evidence the ALJ had already received. *Id.*  The ALJ never informed Rhouma of her right to ask questions or allowed her sufficient time to develop questions to ask.  For example, at the conclusion of Bozek's testimony, the ALJ prompted Rhouma to ask questions.  Rhouma replied, "I'm trying yeah."  (Tr. 138).  But Rhouma never got to ask questions, as Bozek continued speaking on her own and the ALJ concluded questioning Bozek on his own.  (Tr. 138-40).  And unlike with Bozek, Rhouma was never prompted to ask Sarbal or the VE any questions – nor did she ask them on her own.  (Tr. 141-56).

Further, the ALJ affirmatively undertook a duty to obtain records from Comprehensive Psychiatry when, after being informed that Rhouma had received mental health treatment from there, the ALJ said: "[W]e will get those updated.  Any records that we get we'll send to you as well."  (Tr. 112); *see also* (Tr. 155-53).  An ALJ's broken promise to obtain medical records can be reversible error.  *See Strang v. Comm'r of Soc. Sec.*, 611 F. App'x 271, 275 (6th Cir. 2015).

To be sure, the Sixth Circuit has only found a self-imposed duty to obtain records to arise when the ALJ "frequently not[es] their importance to the resolution of the claim and committing to obtain them." *Id.*  In Rhouma's case, the ALJ never expressed himself on the importance of Comprehensive Psychiatry records.  But this court has previously found that distinction surmountable when the missing records are of particular relevance.  *See Tucker v. Comm'r of Soc. Sec.*, No. 1:18 CV 1039, 2019 U.S. Dist. LEXIS 91765, at *31 (N.D. Ohio May 15, 2019).

Rhouma testified that she was being treated at Comprehensive Psychiatry for anxiety, severe depression, and panic attacks in crowded settings.  (Tr. 124).  Bozek testified that Rhouma suffered suicidal ideations.  (Tr. 138).  Sarbal testified that depression was the most significant impediment to Rhouma being able to work, noting that when he lived with her, she'd spend whole days in bed.  (Tr. 142-43).  And Rhouma's records from the Bair Foundation confirm diagnoses of major depression, major anxiety disorder, and PTSD.  (Tr. 622-24).  But even though Rhouma testified that she saw a counselor from the Bair Foundation for ten months at her house, treatment notes from the Bair Foundation provide very little insight into Rhouma's progress with counseling.  (Tr. 111, 631-38). The progress notes set objectives and a target date and inconsistently provided information on whether progress had been made.  *See* (Tr. 631-38). The most recent progress notes, for example, stated that Rhouma "has had positive progress towards goal but needs continued care."  (Tr. 638).  Given the dearth of information about the substance of Rhouma's counseling sessions, obtaining records from Comprehensive Psychiatry to supplement the Bair Foundation records would seem particularly relevant fill in the obvious gap in the record.  *See McCoy v. Comm'r of Soc. Sec.*, 1:16 CV 1301, 2017 U.S. Dist. LEXIS 133244, at *26-30 (N.D. Aug. 18, 2017) (finding that even though the ALJ didn't owe the

claimant a heightened duty the ALJ erred by not obtaining psychiatry records she was made aware of and without which the ALJ was missing 18 months' worth of treatment notes).

The Commissioner invites us to overlook the omission in the record as harmless because Rhouma could have but did not submit the evidence she contends the ALJ omitted to the Appeals Council.  But that's irrelevant to the issue of whether the ALJ breached a duty owed to Rhouma at the hearing stage.  *Sims v. Apfel*, 530 U.S. 103, 112 (2000) ("Claimants who exhaust administrative remedies need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues." (emphasis added)).  As the Sixth Circuit stated, "[t]he lack of medical and vocational documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits."  *Strang*, 611 F. App'x at 276.  Thus, a remand is warranted so that the ALJ may further develop the record.  *McCoy*, 2017 U.S. Dist. LEXIS 133244, at *33.  It could be that the additional records would be inconsequential, but this court is unwilling to affirm the denial of disability benefits after an ALJ committed to, but did not, obtain records he promised to get.  We cannot simply assume those records would not change the outcome of the determination.

The court has other concerns with the ALJ decision that compound the ALJ's failure to obtain records from Comprehensive Psychiatry.  For example, the ALJ found Rhouma's mental health impairments to be nonsevere at Step Two of the sequential evaluation process because she only had mild limitations in the four areas of mental function.  (Tr. 87-88).  One of those areas was Rhouma's ability to interact with others.  (Tr. 88).  Evidence of Rhouma's psychiatric treatment for anxiety, which she testified caused panic attacks in crowded settings, would seem relevant and could potentially change the ALJ's determination that her mental health symptoms only caused mild limitations.  (Tr. 124).

The ALJ's evaluation of Rhouma's subjective symptom complaints at Step Four made no mention of her depression or anxiety diagnoses or symptoms.  *See* SSR 96-8p, 1996 SSR LEXIS 5, at *14-15; (Tr. 89-94).  And the ALJ could not, as he did here, incorporate his paragraph B findings at Step Two as part of the RFC assessment.  SSR 96-8p, 1996 SSR LEXIS 5 at *13; *Garcia v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 805, 811 (S.D. Ohio 2015); (Tr. 89).  Given the sparse content of the Bair Foundation records, it is difficult to discern the basis for the ALJ's "mild" mental health findings.  The ALJ had no obligation to include mental limitations in the RFC, but he was required to state the basis for concluding that the mild limitations resulting from Rhouma's mental health impairments did not result in work-related restrictions.  SSR 96-8p, 1996 SSR LEXIS 5, at *5; *e.g.*, *James v. Comm'r of Soc. Sec.*, No. 1:19 CV 570, 2020 U.S. Dist. LEXIS 28813, at *32-33 (N.D. Ohio Feb. 20, 2020); *Patterson*, No. 5:14 cv 1470, 2015 U.S. Dist. LEXIS 125841, at *9-10; *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 U.S. Dist. LEXIS 23918, at *17 (E.D. Mich. Feb. 27, 2015).

Another concern, which Rhouma raises, was the lack of a consultative psychological examination.  ECF Doc. 14 at 12.  The ALJ wasn't required to obtain one.  *Landsaw*, 803 F.2d at 214.  The regulations simply grant the ALJ discretion to order a consultative examination when there is insufficient evidence from which to make a determination.  *Id.*; *see also* 20 C.F.R. §§ 404.1517; 416.917.  But given the lack of substance in the Bair Foundation progress notes and the missing records from Comprehensive Psychiatry, there would appear to be a lack of evidence concerning Rhouma's depression and anxiety from which to assess the severity of these impairments.

In addition to the ALJ's failure to consider Rhouma's depression and anxiety, the ALJ did not appear to consider any of the ALJ hearing testimony, which Rhouma raises in part.  ECF Doc. 14 at 19.  The ALJ found that Rhouma's alleged symptoms were inconsistent with activities of daily

living reported "[a]t one point or another in the record (either in forms … medical reports or records, or the claimant's testimony)."  (Tr. 29).  The ALJ specifically stated "she is able to complete household chores [cook, wash dishes, launder clothing, sweep, make beds], care for household pets, to use a computer, shop in stores, drive, walk, engage in photography for pleasure, and manage an e-mail account."  *Id.*  But the ALJ did not discuss how he reconciled his evaluation of Rhouma's activities of daily living with her testimony that: (i) she was limited to day-time driving and could not travel long distances due to tremors in her leg; (ii) she cooked by leaving items on the stove and waiting in a seated position; (iii) she could clean only with intermittent breaks and over the course of multiple days; (iv) she used rideable shopping carts to shop; and (v) her hand tremors inhibited her ability to pursue her hobby.  (Tr. 29); *see* (Tr. 116, 129-32).

The ALJ also did not discuss how he reconciled his evaluation of Rhouma's activities of daily living with Bozek's and Sarbal's corroborating testimony that Rhouma's hand spasms caused her to drop things, her fingers sometimes needed to be unclasped, and she had difficulty lifting carrying a laundry basket up and down stairs.  (Tr. 134-35, 145-48).  The ALJ wasn't required to give a full recitation of the hearing testimony.  But he was required to compare Rhouma's testimony of her symptoms with her other documented statements and the evidence of record.  SSR 16-3p, 2016 LEXIS 4 at *21.  The ALJ was also required to consider "statements … provided by medical sources and other persons" and give reasons for rejecting lay witness testimony.  SSR 16-3p, 2016 SSR LEXIS 4 at *10; *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) ("If lay witness testimony is provided, the ALJ cannot disregard it without comment, and must give reasons for not crediting the testimony that are germane to each witness.").  On this record, we can't say whether the ALJ did.  *See Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595, at *16 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").  Here, the ALJ failed even to mention that Bozek and Sarbal had testified.

And lastly, the court has concerns with the ALJ's evaluation of Dr. Arnold's opinion, which Rhouma also contests.  ECF Doc.14 at 12; ECF Doc. 19 at 2.  The ALJ found Dr. Arnold's opinion "no more than partially persuasive" because the limitations he ascribed to Rhouma were "at least partially consistent with, and supported by, the overall evidence of record, described in digest form in the preceding paragraph.  However, as to the specific degree or work-related limitation that might be expected to appertain, this opinion is vague and less than helpful." (Tr. 93).  The disparity between the RFC and Dr. Arnold's opinion makes clear that the ALJ did not find Dr. Arnold's opinion of Rhouma's upper extremity limitations persuasive.  (Tr. 89, 93).  And the basis for that determination appears to be that, even though Dr. Arnold's opinion was supported by his own findings (which the ALJ cited in the preceding paragraph) and consistent with evidence from other sources (also cited in the preceding paragraph), Dr. Arnold's opinion was discounted because it was "vague and less than helpful."  *Id.*  But the ALJ didn't say why Dr. Arnold's opinion of Rhouma's upper extremity limitations (or any limitations for that matter) was vague.  Dr. Arnold opined that Rhouma had "limitations with reaching, grasping, handling, fingering and feeling and the claimant will be able to perform these occasionally due to neck and left hand pain." (Tr. 464).  Dr. Arnold's opinion doesn't seem vague.  "Occasional" is a term of art in Social Security law that means one-third of the time.  *Smith v. Comm'r of Soc. Sec.*, No. 2:16-cv-1010, 2018 U.S. Dist. LEXIS 113, at *11 (S.D. Ohio Jan. 2, 2018) (citing SSR 83-10, 1983 SSR LEXIS 30, at *13).  We could infer another basis for the ALJ's vagueness finding, but it was incumbent on the ALJ to provide a coherent explanation for his reasoning to allow us to conduct meaningful judicial review – especially given that the VE was never asked whether his testimony would change if the hypothetical were further limited to "occasional"

reaching.  *Lester v. Saul*, No. 5:20-cv-01364, 2020 U.S. Dist. LEXIS 247187, at *40 (N.D. Ohio

Dec. 11, 2020); SSR 96-8p, 1996 SSR LEXIS 5, at *7; (Tr. 152-53).

 Any one of these errors could potentially be overlooked as harmless.  But the cumulation

of errors in the ALJ's decision is sufficient to support the court's finding that it is more

appropriate to remand for the ALJ to fully develop the record and issue a new decision.  And

because a remand on the basis of the ALJ's failure to procure records from Comprehensive

Psychiatry on its own is dispositive, we decline to consider Rhouma's other procedural

challenges to the ALJ's decision.  *See McCoy*, 2017 U.S. Dist. LEXIS 133244, at *33.  We also

decline to address Rhouma's challenge to the adequacy of the ALJ's explanation of his Listings

findings, given that the ALJ, in issuing a new decision, may choose to rearticulate his

explanations or make new findings.  ECF Doc. 14 at 17-18.

## IV. Conclusion

 Rhouma lacks standing to contest the constitutionality of the ALJ's decision based on the

president's removal authority.  But because the ALJ breached his duty to obtain psychiatry

records mentioned at the ALJ hearing and which the ALJ agreed to obtain, the Commissioner's

final decision denying Rhouma's applications for DIB and SSI is vacated and Rhouma's case is

remanded for further consideration.

 **IT IS SO ORDERED.**

Dated: December 13, 2021

           Thomas M. Parker

            United States Magistrate Judge